Good morning, Your Honors. If it pleases the Court, my name is Robert Fischler. I represent the responding cross-petitioner, Key Food Stores Co-Operative, Inc. Your Honors, the portion of the Board's order holding that Key Food was a joint employer of its members' employees is contrary to law and is not supported by substantial evidence that Key Food controlled the members' employees. The only evidence of joint employer status was Key Food's participation in collective bargaining, which is not enough as a matter of law, and in this case is particularly weak evidence of employee control, because the bargaining did not result in a collective bargaining agreement that set the terms and conditions of employment for the relevant employees. Didn't Key Food send a lawyer and someone else to all the negotiations with the unions? Well, Your Honor, Key Food did participate in the collective bargaining, there's no doubt about that. It had a lawyer that also represented the members. So Key Food, the evidence is clear that Key Food participated in the bargaining. It was more than, Mr. Fischler, it was more than participation, they ran the bargaining. First of all, the agreement that they had with the member stores specifically said that the member stores were bound by any labor agreement that is negotiated by Key Food, right? So contractually, it was set up so that Key Food would be running the negotiations, and in fact, they did run the negotiations, the attorney and the CFO dealt with all the proposals and the counterproposals. So there was a contractual provision, and then the practice was that they ran it. Your Honor, I don't believe the substantial evidence supports that conclusion that Key Food ran the collective bargaining. Well, let me just ask you, from a contractual matter, I'm correct from a contractual matter that they were going to negotiate it, and the member stores are going to be bound by it, right? Isn't that what the contract says, section 5.4? Technically, Key Food had the right to negotiate a collective bargaining agreement, and the members did agree to be bound, as in reality, what happened was, and there is undisputed testimony to this effect, the members authorized all of the offers that were made by Key Food, as between Key Food and the members, it was always understood that Key Food had no authority to bind the members unilaterally. They had that exact discussion with the union representatives at the very first- I know, but just because the member stores had ultimately had to sign off on it doesn't mean that Key Food wasn't running it. Those aren't inconsistent with each other. Well, Your Honor, they didn't run it, though I would respectfully disagree with that characterization. The evidence is overwhelming. Who did all the proposals and the counterproposals go to? Didn't they go to- They went to the union. Did they go to Mr. Catalano and CFO, going back and forth? No. No, Your Honor. Key Food, first of all, the members actively participated in the negotiations. They participated through a three-person members committee that was selected by the members to negotiate for the 22 out of the 24 stores, which are the stores the members bought. They participated through Mr. Catalano, who was their legal counsel, as well as Key Food's legal counsel, to be sure. And they participated through- Didn't Sharon Kanselman, Key Food's chief financial officer, participate as well? Yes, indeed, she did, Judge Pooler. Again, I would submit that this was nothing more than routine participation in a multi-employer bargaining unit. It was nothing untoward about it. And even if- No one says it was untoward. It's just that they were bound together by these actions. There's no question that they- And I think the administrative law judge got this right when he talked about the fact that Key Food, which, remember, bought two stores that had union employees, and the members who bought 22 stores that had union employees, joined together to attempt to negotiate with the union a common agreement that would cover all 24 stores. That is, we would submit dog bites man material. It is a routine participation in multi-employer bargaining unit. But even if, Judge Bianco, to go to your question, even if we assume for the sake of argument, and again, I do not believe the substantial evidence supports the conclusion, but even if we assume for the sake of argument that Key Food, quote, ran the negotiations or played a controlling or somewhat dominant role in the negotiations, the law tells us that that by itself is not enough. As this court specifically held in AT&T and again in International House, quote, even a very substantial degree of centralized control of labor relations does not in itself determine the joint employer issue. In both of those cases, this court rejected joint employer status where I would submit the evidence of day-to-day control of the relevant employees. What about on that issue on 870, the appendix is an email from Ms. Conselman telling the member stores, if you have any questions about what you can or should do with respect to union associates, hiring, employing, training, scheduling, terminating, paying benefits, please contact our labor attorney. Why isn't that some indication of ongoing involvement in all aspects of their terms and conditions? Because, Your Honor, first of all, that was an informational email. There is no evidence that summarized for the members who were buying stores the agreement that had been reached with the three unions that are not party to this appeal. Remember, Key Food and the negotiating members jointly reached agreements with three other union locals other than local 342, which is prosecuting this appeal through the General Counsel. That email is an informational email that lays out the general parameters of what those agreements had provided to provide some framework for those members in making their own hiring and firing decisions. And in fact— What about Mr. Abetz said when there's a dispute over hours that he couldn't—local 342 wanted to deal with him. I can't do anything without Key Food. Wasn't that— Well, that was not—excuse me, sorry. No, go ahead. That was not a dispute over hours. That had to do with some leafletting in front of the one store, the Albany Avenue store in Brooklyn. So it had nothing to do with any of the issues in this case. And at most, it pertained to one out of 24 stores. But it really is not any indication that Key Food— How about Albany Avenue giving out Key Food rules and regulations handbook to its employees? What about that? That handbook relates to that particular store. It is not when it is entitled Key Food rules and regulations, but there is no evidence that Key Food, the cooperative entity that's prosecuting this appeal, had any role in that. And in fact, the only testimony that it all relates to it is Consulman's testimony that Key Food had no role in connection with handbooks at the members' stores. In addition, there's no testimony as to when that was prepared, who prepared it, how old it was. I'm sorry, Judge Cabrera. That's OK. No, no, it's all right. Your time is up. I think we got the substance of what you were just saying. Thank you. Fear not. Fear not. Thank you. All right. Thank you. All right. We'll hear from—who else is to be heard? Is it 1525 Albany Avenue? Yes. Good morning, Your Honors. May it please the Court. My name is Scott Wick, and I represent the individual members' stores in this matter. I'd like to take a second and begin by making a reference. I think it's relevant to a quote from Abraham Maslow in The Psychology of Science, half a century ago. Maslow said, when all you have is a hammer, everything looks like a nail. In this case, the NLRB, we urge, overstepped its bounds in trying to apply and misapplying labor law concepts to a bankruptcy proceeding. The start of this case is found by efforts by Judge Drain in the U.S. Bankruptcy Court back in 2015 to locate buyers of failed grocery stores that were owned by the time by A&P. An asset purchase agreement in July of 2015 was entered into between the cooperative and A&P. Four points are notable in that agreement with respect to whether or not my clients, the members' stores, were perfectly clear successors. Point one. In that agreement, there was no assurance that any of employees of A&P would actually be hired. Substantially all. Didn't it say substantially all? Your Honor, the original agreement actually said all. The original agreement said all employees. And it was amended to say substantially all. Amended to say substantially all. But in both instances, Your Honor, it was offers of employment. Not that my clients would hire, but that we would simply make offers. What would be the end result of an offer of employment? It would be a hiring, correct? Or it could be a rejection of the offer of hiring, which gets to a second point in both agreements, Your Honor. There was nothing in either the original or amended asset purchase agreement that set forth what exactly those terms of employment would be in that offer. It could have been under the original agreement. It says in the asset purchase agreement, shall make the offer of employment consistent with the terms and conditions required by the governing effective labor agreements or modified labor agreements to the extent applicable. Why isn't that explained? That if you want to be a perfectly clear successor at the time of that agreement, you have to make them aware that you're going to propose new terms. And that hardly suggests there's going to be new terms at that time, simultaneous with the announcement of the agreement. You would have to make clear right then and there, you're going to be offering new terms. I don't see how that was done. Well, Your Honor, I would respectfully suggest to the court that that puts the horse in front of the cart. In the first instance, the NLRB law requires that employees have been advised, communicated, been informed in some manner that they would be continued on as employees. And that simply is not found in this record evidence. There's nothing in the record showing that employees were communicated, misled or otherwise informed. You never told the union that you were not honoring the contracts and adopting those terms and conditions. The union was never informed of that fact. Isn't that correct? Your Honor, during the first negotiating session, approximately a week later, they absolutely were told and were in fact told according to their own bargaining notes, that unless an agreement was reached that was different than what was with A&P, there may be no purchase of these stores at all. And that the stores may end up being TD Banks. That was from the union's bargaining notes. So I would respectfully suggest that the union was put on notice from the very start, the first communications between the co-op, the members and the union, that we had no intent of continuing the same conditions of employment. And also to Judge Bianco's point, the modified labor agreement, right? We could, the members could have made offers of employment based on a modified labor agreement. That could have, if the unions had agreed under a modified labor agreement, contained vastly different terms and conditions of employment, different lower wages. No, but that only tells an employee that that could happen down the line. It doesn't tell them at the start of this relationship, there are going to be new conditions that are going to be set by the employer. That's what's required. Not that there could be conditions down the line. They knew that. Everybody knows that that could happen, but that's not what the law is with respect to perfectly clear successor, right? And your honor, I would also suggest it also doesn't tell employees that we have, that we are going to continue their employment. Again, I don't understand. It says buyer shall make an offer of employment. So why wouldn't an employee reading that thinking, okay, I'm going to get an offer employment that I can accept. I don't understand what you're arguing. Isn't that what that says? If you're going to get an offer of employment, the employee is going to think, I'm going to get an offer of employment under the conditions that are under the agreements now that could be modified down the line. Why am I misreading that? Because your honor, in the original agreement, it says the agreements that were in effect or a modified agreement. And then the amended agreement talked about those or if neither an adopted or modified agreement were in place, the last best offer. So, and that was the agreement that was closed on. If you, I know, but if the employees, that was months later, the employees already been communicated this original agreement. They rely on that. They continue their employment. Then I don't know under the law that you can then say based upon an amended agreement later that we are now, you know, not a perfectly clear successor. I think the law says that you can't do that once they've arrived on your first communication. And I would respectfully urge where in the record does it show that employees either were communicated the language in that original asset purchase agreement or relied on it? And I see that my time is up. Thank you. Thank you. And who is appearing here today for the NLRB? Good morning, your honors. This is Joel Heller for the National Labor Relations Board. This is your big chance. Thank you, your honor. May it please the court. Substantial evidence supports the board's finding of over 30 unfair labor practices committed by the member stores. The stores now attempt to relitigate nearly every issue before the court of appeals, but they offer no grounds for displacing the board's judgment under this court's deferential standard of review. And the board's finding of a joint employer relationship between Keyfood and the member stores is likewise a question of fact and is likewise supported by the record evidence. Now, I know there's a lot going on in this case. So I want to make sure that I address any particular areas of interest for the court. And so I think I will start with the successorship issue. Now, to be a perfectly clear successor, because I would like to take a step back and kind of explain the purpose of this doctrine, because I think a lot of the store's arguments kind of misunderstand what the purpose of the doctrine is. And a successor employer conveys an intent to hire current employees and not to set new terms unilaterally. The point is to protect employee reliance interests. And that's what we have going on here. The employees were told through their union that in the asset purchase agreement that the member stores would make offers of employment for substantially all employees. And that the terms of those agreements, those offers would either be on existing terms and conditions of employment or new terms negotiated by their union. Mr. Heller, I don't mean to interrupt you, but your adversary emphatically said at the end, there was nowhere in the record that it indicates that that agreement was communicated to the employees. What's your response to that? So it was communicated to the union. And the law is that communications to a union is equivalent or it counts as communications to the employees represented by the union. Is it clear in the record that it was communicated to the union? Is that clear? It was, the asset purchase agreement was submitted to the bankruptcy court. The International UFCW was a party to the bankruptcy proceedings. They were on notice when it was filed with the court of the terms of the asset purchase agreement, which they then told to a local 342. And that's where you have the notice to a union is equivalent of notice to the employees. And so at that point, employees had a reliance interest. They knew that either they would have the same terms or if they did have new terms, it would be their union that would have to agree to it. And now it's true that the Key Foods and the member stores told the local 342 that they did want new terms and conditions of employment. But what they said is they wanted to bargain for new terms and conditions. They never said that they would impose those new conditions unilaterally. And that's the difference here. I point you to the decision in first student board decision and the DC circuit decision enforcing it, which talks about this issue. The duty to bargain as a perfectly clear successor means you have to bargain over any changes. And that's what the member stores said they were going to do here. The intent to bargain does not mean an intent to act unilaterally. That's actually the opposite of an intent to bargain. So I think Judge Bianco, you are exactly right in drawing that distinction because that's what the facts of this case bear out. I am also confused by the idea that the duty to make an employment offer is not an indication that the employees would be employed by the successor employee, by the successor employer. An employment offer includes the idea that if you accept the offer, you will be employed. Not that the employer can subsequently deny the offer that it made to you. And as to the amended asset purchase agreement, again, I think Judge Bianco is exactly right that this happened too late in the game. It was three months after the union was told that terms would be either the same or negotiated. And the law is clear that you cannot come in as the board put it at the 11th hour and say, actually we are going to make new changes or new terms and conditions of employment. Because at that point, the employees have relied to their detriment on the earlier representations and have stuck around. The amended asset purchase agreement was not communicated or there's no evidence it was communicated to the union until late October, which again was three months after the initial APA and was also weeks. And in some cases, days before the stores were going to open. So I do believe that the evidence supports the board's finding that the member stores were perfectly clear successors. At Key Foods, the contractor talks in terms of Key Foods and it's a science- It's a little unusual, Mr. Heller, that they did have the amended agreement. Obviously it's approved by the bankruptcy court. And essentially what I think is being argued and was found here that even if they followed that order as it was written, that would then be a violation because it would be unilateral action. So their argument is essentially, we're complying with the terms that were approved by the bankruptcy court and we're being found to have committed a violation. Do you want to respond to that? Sure, I'll make two points in response to that. One is I just want to make clear, this is not an issue of bankruptcy law. I mean, the amended asset purchase agreement was negotiated by ANP and Key Foods. They're the ones that drafted and signed the agreement. It was later approved by the bankruptcy court, but it's not coming from the bankruptcy court itself. And the second point I would make is that even by its terms, the amended APA does not permit the unilateral layoffs that the member stores did here because as we just explained in the brief, what the amended APA says is that the offers in employment have to be made either on the terms then existing terms negotiated by the union or the last best offer. The last best offer is a labor law term of art. It means the offer that was on the table immediately prior to the parties reaching impasse. There was no claim that the parties were at impasse and so that they were not, even under the terms of the amended APA, permitted to act unilaterally in making these layoff decisions. These are sophisticated parties that have been dealing with labor unions for years. They use the term last best offer. It's reasonable to read that offer as taking its meaning from, as including the meeting that it has in the labor relations context. So I'll move on to the joint employer issue. I guess just 10 seconds on the discrimination violations. I think those are all pretty straightforward instances of anti-union discrimination. We go through them in the brief, largely supported by factual findings and credibility determinations, which are two areas where the board receives significant deference. So the joint employer issue, again, backing up, please keep in mind that a finding of joint employer status is a question of fact that is reviewed under the substantial evidence standard. And the facts of this case show that Key Food had control over terms and conditions of employment. As the panel went through earlier, the evidence is that Key Food, or that the member stores were contractually bound to accept any collective bargaining agreement agreed to by Key Foods. And in practice as well, Key Foods dominated the collective bargaining process, either through the attorney it hired or through its CFO. Now the stores were present. Members, representatives from the individual stores were present at some, though not all of the bargaining sessions. But they essentially played a secondary role. And there were numerous times in which the union attempted to bargain with the stores individually, but were told they could not do so, both by the Key Food lawyer Catalano and by the stores themselves. And- What about the argument that that's only one factor in the analysis that even if you assume domination of the negotiations that- Sure. The board didn't really look at the other factors. Well, sure. So I guess two points in that. One is that it's not really an argument that was made before the board. And so the issue is not properly preserved with the Court of Appeals. There's actually a jurisdictional bar under section 10E of the act. There's no what I would call matter of law arguments made to the board. They're mostly factual arguments. And there was no indication that the board's finding was somehow inconsistent with this court's case law with the AT&T decision. None of those were cited to the board. But even addressing the point on the substance, the board did consider more than what happened at the bargaining table. The member stores were also bound by any employment offers that Key Food had to make and that Key Food made. And as we've been discussing, Key Food was- The Key Food bound the stores to make offers of employment to all or substantially all of the current employees. So Key Food was essentially imposing upon the member stores the makeup of their workforce. There was the instance we talked about before where the union went to the owner of either Greaves Lane or Albany Avenue about the leafleting, about the hours issue and said, hey, can we work this out? And the owner said, he couldn't do anything without Key Foods because Key Foods wouldn't let him. We have the fact that Key Foods was not only involved in the CBA process, but also in the end result because collective bargaining agreements signed with other union locals, Key Foods signed those agreements. They were denominated the employer in those agreements. Now it's true that some of the stores also signed the agreements, but that only shows that they were joint signatories to the CBAs. And the point here is that they were joint employers. We don't have to show that Key Foods was the sole or exclusive employer. And the standard for joint employer is that the two entities share or co-determine. So it's enough that they shared control over terms and conditions of employment. The evidence supports that here. It's substantial evidence standard of review. So we ask that you enforce the board's order in full. Thank you very much, Mr. Helder. Thank you. We'll turn to Mr. Fischler who has reserved some time. Thank you, Your Honor. I'll be brief. I would simply like to say that upholding the joint employer finding in this case would require a true deviation from this court's precedent, particularly as articulated in AT&T and International House and in the Clinton's ditch case, all of which are discussed in our briefs. This court traditionally looks in addition to participation in collective bargaining, regardless of the level of control exercised that it looks to whether the putative joint employer hired and fired particular employees, disciplined or supervised those employees, was involved in setting wages, benefits, or work schedules for those employees or handled payroll, insurance, taxes, record keeping, or other administrative issues relating to those employees. It is undisputed that there is zero evidence of any of those factors or anything else. And there's other hodgepodge of evidence that the board points to, I would submit, has no probative value on the issue of whether key food exercised control of the employees. Remember, ultimately, the issue is not control of collective bargaining. It is whether ultimately there was control of the employees. Here, there's no collective bargaining agreement that set the terms and conditions for employment and no other evidence that the employees were controlled by key food. Thank you. Thank you, Mr. Fisher. Is counsel for Albany Avenue at all available? Yes. Thank you, your honor. I just have three quick points with my remaining time. First, to the question of the important distinction between an employment offer and hiring employees, which is significant because successorship is always based under burns on the hiring of a majority of employees. Successorship and perfectly clear successors is based on the presumption that a majority of employees will be hired because they've been led to believe that their terms and conditions will not change. I would suggest under the terms of a modified agreement as a hypothetical to make a point, let's say A&P employees were making $20 an hour with A&P, but a modified labor agreement suggested that they would make $8 an hour. Well, there's no assurance in that type of situation that they would be hired and that they would constitute a majority of the workforce of the buyer. Second, in terms of the notice to the employees, Mr. Heller, I believe conceded that there is no communication directly to the employees, but over the span of some indeterminate time, information allegedly made it to employees. In the meantime, a week later, the co-op was already talking to the union saying that we were not going to accept the A&P terms. And lastly, the NLRB's position is in essence that there would have been no sale of bankruptcy assets at all because a labor law in pass had not been reached, which begs this final question. Will this court commit a government agency, the NLRB with no expertise in bankruptcy law to rewrite the orders of bankruptcy court judges? This isn't core bankruptcy issues. These aren't core bankruptcy issues. I would suggest, Your Honor, that the terms of that agreement incentivized buyers to take these assets out of bankruptcy. So I would suggest that these are very much core issues before the bankruptcy court. Thank you very much, Mr. Wick. Thank you, Your Honors. We'll reserve the decision and we'll turn to the